ISAAC ISENBERG, Appellant, *v.* ST. LOUIS AND VICKSBURG ANCHOR LINE, Respondent.

### March 13, 1883.

1. COMMON CARRIERS — AGREED STATEMENT OF FACTS. — In an action against a common carrier for the non-delivery of goods, the burden of excusing the non-delivery is on the carrier, and an agreed statement of facts will be taken most strongly against him.

2. —— SALVAGE. — In such an action, that the carrier abandoned the goods to a wrecking vessel because he had not the means with which to raise and repair his boat, furnishes no ground for charging the shipper with salvage, where it does not appear that the cargo could not have been saved.

3. —— In such an action, it will not be presumed that the plaintiff's goods were not among those shown by the agreed statement of facts to have been taken on shore before the boat sank.

4. —— A carrier who, without necessity, abandons to a wrecking vessel goods which he might have forwarded, is liable to the shipper for their full value.

APPEAL from the St. Louis Circuit Court, HORNER, J. *Reversed and judgment.*

L. B. VALLIANT, for the appellant : The burden of showing circumstances that would justify or excuse the non-delivery of the goods is on the carrier. — Story on Bail., sect. 574, note 7 ; *Levering* v. *U. T. & I. Co.*, 24 Mo. 88. " Salvage is the compensation allowed to persons by whose assistance a ship or its cargo has been saved in whole or in

part from impending danger, or recovered from actual loss in cases of shipwreck, derelict, or recapture." — 3 Kent's Comm. *245–247 ; Dixon on Maritime L., No. 169. Defendant acted on the idea that, as striking a snag was "a danger of navigation," which was excepted in the bill of lading, therefore, as soon as the Colorado struck a snag, all further duty and responsibility of the carrier ceased ; that the carrier had a right to abandon his charge there and turn it over to the first man who came along. Such is not the the law. — *Daget* v. *Shaw*, 3 Mo. 265 ; *Collier* v. *Valentine*, 11 Mo. 299 ; *Steamboat Lynx* v. *King*, 12 Mo. 272 ; *Hill* v. *Sturgeon*, 28 Mo. 323.

NOBLE & ORRICK, for the respondent : " Salvage will be decreed on all property saved on the sea or wrecked on the coast of the sea."— *The Cheeseman* v. *Two Ferry Boats*, 2 Bond, 574. The uniform rule is to consider the service "performed as one general salvage service, to be compensated by awarding a certain quantum of the whole proceeds, and no distinction is made in awarding salvage between the vessel and the cargo, or between different portions of the cargo."— *Montgomery* v. *The Leather*, Newb. 421 ; *The Albion Lincoln*, 1 Low. 76 ; *The Vesta*, 2 Hogg, 189. " Salvage is awarded in case of goods cast ashore, notwithstanding a state law in force which applies to the case."— *Stevens* v. *Argus*, Bee, 170 ; *Persch* v. *Ware*, 4 Cranch, 347. "A salvator has a qualified property in the articles saved, and he need not remain in the actual possession in order to maintain his right."— 1 Ld. Raym. 363. " A situation of actual apprehension, though not of actual danger, makes a case of salvage compensation."— *Talbot* v. *Seeman*, 1 Cranch, 1 ; *The Saragossa*, 1 Ben. 551.

THOMPSON, J., delivered the opinion of the court.

This was an action to recover of the defendant, a corporation engaged as a common carrier of goods, the value of certain goods shipped by the plaintiff on one of the defend-

ant's boats, from St. Louis to Greenville, Mississippi, and which were not delivered.

In its answer, the defendant, in excuse for the non-delivery, pleaded that the boat on its voyage down the river struck a snag, without any fault of defendant or its servants, and filled with water, and sank, and that the plaintiff's goods were thereby lost, except the two boxes of tobacco, which, " being in great danger of loss by reason of the sinking of said steamboat as aforesaid, were rescued and saved by the board of underwriters of St. Louis, a corporation of the state of Missouri, then and there duly authorized to take charge of such property for the owners, and claim its salvage for the same ; " that the tobacco was yet in the hands of the board of underwriters, who had offered it to the plaintiff if he would pay the salvage, and plaintiff had refused.

The reply admitted that the boat had struck a snag and had partly sunk, but only in shallow water, which covered only a part of the lower deck, leaving all the rest of the boat dry and above water, and a large part of its cargo uninjured, and not sufficient to render it untenable or to make it necessary for the officers and crew to abandon it, and that the defendant, by the use of proper care and attention, could have saved the plaintiff's goods from loss, but that, disregarding its duty, it delivered the steamboat and all the goods to the board of underwriters, a private corporation with whom the plaintiff had no concern ; denied that any of the plaintiff's goods were lost, but averred that they were all delivered by defendant to the board of underwriters, which was a private corporation chartered by an act of the general assembly of Missouri, entitled "An act to incorporate the board of underwriters of St. Louis ; " approved January 14, 1860, and had no authority to interfere ; and that the boat did not sink within the jurisdiction of this state.

The cause was tried by the court below upon an agreed statement of facts, in substance as follows : —

"The plaintiff's goods, of the description and value stated in the petition, were shipped on the defendant's steamboat Colorado, to be carried from St. Louis to Greenville, Mississippi, and a bill of lading issued for the same with the usual clause of dangers of fire, navigation, explosion, and collision excepted. The goods were not insured. The boat, proceeding upon its voyage, at some point below Cairo, opposite the Kentucky shore, without any fault on the part of the defendant or its servants, struck a snag and began to take in water very rapidly ; and the captain, seeing that it would sink, caused it to be run into shallow water against the bank on the Kentucky shore, where it was made fast to the shore by cable and there settled upon the bottom, the water coming over the lower deck at the stern and covering a considerable part of the lower deck. All in front of the stairway was above water and dry, and the whole starboard guard from the wheel forward was dry. It was an ordinary side-wheel steamboat. The officers and crew remained on the boat all the time. She was raised and repaired in two days, and they returned with her to St. Louis.

"As soon as the boat, after the accident, was made fast to the shore, the captain had all the freight taken off and stored on the bank and covered with tarpaulins, except some of the freight which was in the hold, and which they could not get at. The water rose so fast that some of the freight which was taken out of the engine-room was wet and damaged.

"About two days after the boat had sunk, Captain Keiser, representing the board of underwriters, arrived with a wrecking boat called the Ekart, by means of which the Colorado was raised and repaired and returned to St. Louis, bringing with it the freight that remained in the hold. The

captain of the Colorado did not have the means with his crew to raise and repair his boat, and some such appliances as the Ekart had were necessary for the purpose.

"As soon as Captain Keiser arrived, the captain of the Colorado gave into his possession the steamboat Colorado and all the freight which was stored on the bank; and also that which remained in the hold. The freight on the bank was shipped immediately back to St. Louis, on boats of the defendants, and delivered to the board of underwriters, and that in the hold was brought back on the Colorado and likewise delivered to the board of underwriters. All of the plaintiff's goods were delivered by defendant to the board of underwriters at St. Louis. The five boxes of wine were found to have been wet and the labels on the bottles were defaced, and they were sold by the board of underwriters at auction, for $18.15, and the proceeds paid over to D. R. Powell, who was and is the average adjuster of the board of underwriters. The rest of plaintiff's goods were received by the board of underwriters in good order, and are now in its possession.

"After the cargo was received by the board of underwriters, they proceeded to make a general average adjustment against the boat and cargo, which was made according to the practice of that corporation, by D. R. Powell, its adjuster; in which adjustment there were average charges assessed against all of the plaintiff's goods, which charges the plaintiff has not paid, and the proceeds of the wine are not sufficient to pay the average charges against the other goods of plaintiff. Plaintiff had no notice of the average adjustment, or sale of the wine, until after they were made. The wine was sold before the average adjustment was made. The board of underwriters, prior to the institution of this suit, have signified to plaintiff that they were willing to surrender to him said tobacco and cigars upon his paying said charges, which he declined to do. Plaintiff is and was at the time a citizen of Mississippi

"The charter of the board of underwriters, being the act of the 14th of January, 1860, above mentioned, was a part of the agreed statement of facts."

Upon the foregoing agreed statement of facts, the court gave judgment for the defendant. We are of opinion that this judgment cannot be sustained. The foregoing agreed statement must be read and interpreted in the light of the rule that the burden of excusing non-delivery is upon the carrier. *Levering* v. *Union Transp. & Ins. Co.*, 42 Mo. 88. It follows that it is to be taken most strongly against the defendant, just as any affirmative pleading is to be taken most strongly against the pleader. It is more important, therefore, to consider what it fails to show than what it does show. It fails to show any necessity for abandoning the plaintiff's goods to a stranger. It shows, that the plaintiff's goods were abandoned to the board of underwriters, not because the defendant could not save them, nor because it could not have saved the whole cargo, but because its captain did not have the means, with his crew, to do what? — to save the plaintiff's goods, or to save the cargo? — no; but " to raise and repair his boat." Therefore, he concluded to call in a third party who had means and appliances to repair his boat, to perform this service for the defendant; and the contention now is that plaintiff shall contribute to pay for this service.

Again, the agreed statement of facts shows that at the time when the defendant's boat was turned over to the wrecking steamer, a portion of its cargo was on shore; and, as it does not state that the plaintiff's goods were *not* on shore, we must, under the rule already stated, presume that they *were* there. Upon what principle, then, could they be held to contribute to the expense of raising the defendant's boat? Not on the principle of *salvage*, for *they* were already saved, and were not in peril. 3 Kent's Comm. *245. Besides, salvage is a compensation allowed to *strangers*, who imperil their lives to save ship and cargo. When was

it ever heard that it could be awarded to the ship-owner himself, who is under a continuing duty to save the cargo entrusted to his care?  Nor is it a case of *general average,* for no part of the cargo was sacrificed, nor was it necessary that any should be sacrificed to save the rest.  3 Kent's Comm. *233.  It was simply a case where a carrier by water, whose boat had met with an accident, which required her to be raised by a wrecking vessel and taken back to dock for repairs, abandoned the plaintiff's goods to such wrecking vessel, whose owner had no interest in them as an insurer or otherwise, without necessity, and when, for aught that appears, the carrier might easily have found means to forward them to their destination.  A carrier cannot do this without answering for the value of the goods.

The judgment of the circuit court must be reversed, and judgment will be entered by the court here for $298.52, the value of the goods, as shown by the agreed statement, with interest from the 8th day of September, 1880, the date of filing the suit.  It is so ordered.  All the judges concur.